In the Supreme Court of Georgia

Decided: February 4, 2019

S18A1209. FLANNIGAN v. THE STATE.

WARREN, Justice.

Appellant Gabriel Flannigan appeals his convictions for malice murder

and other crimes stemming from the shooting death of Quantavious Ragsdale

on November 17, 2007.[1] Flannigan raises two claims of ineffective assistance

---

[1] A Fulton County grand jury first returned an indictment in this case in 2008, but on August 10, 2010, a grand jury re-indicted Flannigan and Vantrez Jones for malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); felony murder predicated on criminal attempt to possess MDMA, a drug more commonly known as Ecstasy (Count 3); hijacking a motor vehicle (Count 4); armed robbery (Count 5); aggravated assault (Count 6); and possession of a firearm during the commission of a felony (Count 7). Flannigan's trial began on August 24, 2010, and on August 30, 2010, the jury found him guilty of all charges. That same day, the trial court sentenced Flannigan to life in prison for malice murder, ten consecutive years for armed robbery, and five consecutive years for the firearm offense. The felony murder verdicts were vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (434 SE2d 479) (1993). The trial court then properly merged the aggravated assault verdict into the malice murder conviction, but erroneously merged the hijacking verdict into the armed robbery conviction. See OCGA § 16-5-44.1 (d) ("The offense of hijacking a motor vehicle in the first degree shall be considered a separate offense and shall not merge with any other offense."). This merger error, however, benefits Flannigan, and the State has not challenged the error by raising it in a cross-appeal. Under the circumstances of this case, we will not exercise our discretion to correct the error. See *Dixon v. State*, 302 Ga. 691, 697–698 (808 SE2d 696) (2017). On September 23, 2010, Flannigan filed a motion for new trial, which was later amended by his new counsel on February 29, 2016. The trial court denied the motion for new trial, as amended, on June

of trial counsel and contends that the trial court erred in admitting irrelevant and prejudicial evidence. We conclude that these claims have no merit and affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed that Flannigan's co-indictee, Vantrez Jones,[2] called Flannigan on the morning of November 17, 2007, and asked him if he knew anyone who sold Ecstasy pills at a good price. Flannigan said that he did. Using a red Chevrolet Cavalier that belonged to Tiera Jones, Vantrez Jones's sister, whom Flannigan had been dating off-and-on, Flannigan picked up Vantrez and drove him to a gas station near an apartment complex in Fulton County. The two men walked into the apartment complex, and Flannigan asked his cousin, Xavier Woods (who lived in the complex), for Quantavious Ragsdale's phone number. Shortly after that, Ragsdale drove into the apartment complex in a white Ford Excursion. Ragsdale's friend, Brian Williams, was also in the Excursion. Flannigan, who was wearing a dark, one-piece coverall, approached the Excursion and spoke with Ragsdale about

---

23, 2017. Flannigan filed a timely notice of appeal, and the case was docketed in this Court for the August 2018 term and submitted for decision on the briefs.

[2] Jones was granted use immunity, see former OCGA § 24-9-28 (a), and testified against Flannigan. The use-immunity provision is found in the new Evidence Code at OCGA § 24-5-507 (a).

buying Ecstasy pills. Ragsdale did not have any Ecstasy with him and said that he would have to go somewhere else to get it. Williams then got out of Ragsdale's Excursion and walked to the front entrance of the apartment complex. Jones and Flannigan waited in the apartment complex for Ragsdale to return. Williams saw Ragsdale drive out of the complex and then return by himself about 20 minutes later.

Jones testified that, when Ragsdale returned to the apartment complex, Flannigan got in the back seat of the Excursion and Jones got in the front. Ragsdale passed Flannigan the pills Flannigan had requested, and Jones handed Ragsdale money. Flannigan struck Ragsdale in the head with a handgun and told him to take his pants off. Flannigan then shot Ragsdale in the head and pulled him out of the Excursion. Flannigan and Jones left the apartment complex in Ragsdale's Ford Excursion and went to retrieve Tiera's car from the gas station where they had left it earlier. Later that day, with Flannigan driving the Excursion and Jones driving Tiera's red car, the two men drove to a park near their neighborhood in DeKalb County and left the Excursion there. Jones testified that Flannigan exited the Excursion with a skullcap in one hand and that the two of them then drove to Jones's mother's house. A man who lives near the park where Flannigan and Jones left the

3

Excursion testified that, on the day of the crimes, he saw a man get out of an Excursion at the park holding what looked like a rag and get into a red car, which then left the park. The man called the police, and an officer responded to the scene. That officer testified that there was blood on the driver's seat and door and that papers were strewn all over the Excursion. Two of Flannigan's fingerprints were later found on an envelope collected from the back seat of the vehicle.

Other evidence also implicated Flannigan. Ragsdale had been shot near the front of Woods's apartment. Woods testified that, because Flannigan had asked for Ragsdale's phone number, he called Flannigan's girlfriend and asked her where Flannigan was. She told him where to find Flannigan, and Woods and his brother went to confront him. Woods told Flannigan that he hoped that Flannigan "had nothing to do with that, not in front of my house with my mom and my granddaddy staying there." Flannigan admitted that he had purchased Ecstasy from Ragsdale that day, but denied any knowledge of the shooting. When Woods saw Flannigan, which was about an hour or two after the shooting, Flannigan was no longer wearing the one-piece coverall he had been wearing when Woods saw Flannigan earlier that day. Woods added that, several days later, after Flannigan learned that the police wanted Woods and

4

his girlfriend to provide statements about the murder, Flannigan called him and told him that "you-all ain't giving a f**k about me, you-all wait 'til I don't give a f**k about you-all, and you need to tell that b**ch to shut up."

Additionally, Ragsdale owned a brown Louis Vuitton wallet with a beige "LV" on it. Tiera Jones testified that Flannigan was carrying a wallet matching that description when he returned to her apartment after the shooting. Because she had never seen Flannigan with that wallet, she asked whose it was; Flannigan responded that it was his. Tiera also testified that, several weeks before the incident, she heard Flannigan tell someone that "they was going to do something [to Ragsdale], get him or whatever." And several days after the incident, Flannigan tried to wash a black, one-piece coverall at Tiera's apartment. She saw dark brown stains on the suit and asked Flannigan what they were. He said it was mud, but she "knew it wasn't mud" and told him that he could not wash it there. Tiera also testified that a day after Flannigan overheard her talking to the police on the telephone, he attacked her while she was in her car, shattering her driver's window and breaking her left arm and a finger.

Flannigan does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's

practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Flannigan guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Flannigan contends that his trial counsel provided constitutionally ineffective assistance in two respects. We conclude that both claims are without merit.

To succeed on a claim of ineffective assistance of counsel, Flannigan must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to him. *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the prejudice prong, Flannigan must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the

6

reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

(a) Flannigan's first claim is that trial counsel provided ineffective assistance when he did not object to the State's failure to lay the proper foundation for Officer Remmick to offer expert testimony that Flannigan's fingerprints were found on the envelope located in the backseat of Ragsdale's Excursion. We disagree.

To qualify as an expert, "generally all that is required is that a person must have been educated in a particular skill or profession; his special knowledge may be derived from experience as well as study. Formal education in the subject at hand is not a prerequisite for expert status." See *Davis v. State*, 301 Ga. 397, 406–407 (801 SE2d 897) (2017) (quoting and applying *Allen v. State*, 296 Ga. 785, 790 (770 SE2d 824) (2015), a case decided under old Evidence Code, which is applicable to this case) (quotation marks omitted).[3] Accord *Billings v. State*, 293 Ga. 99, 104–105 (745 SE2d 583) (2013). Moreover, the "'trial court has broad discretion in accepting or rejecting the

---

[3] *Davis* was decided under the new Evidence Code, but it noted that "'the evidentiary requirements relating to the admissibility of expert opinion testimony in a criminal case under the new Evidence Code (OCGA § 24-7-707) are nearly identical to those that applied under the former Evidence Code (OCGA § 24-9-67)'" and that it therefore "'is appropriate to rely . . . on decisions under the old Code.'" *Davis*, 301 Ga. at 407 n.10 (citation omitted).

qualifications of the expert, and its judgment will not be disturbed on appeal absent an abuse of discretion.'" *Davis*, 301 Ga. at 407 (quoting *Allen*, 296 Ga. at 790).

Here, the record shows that Officer Remmick did not testify about his specific training or experience regarding fingerprint evidence. But Officer Remmick did testify that he had been a crime-scene technician for the Fulton County Police Department for six years and had been a special agent for the Criminal Investigation Division of the United States Army for 20 years before that. He further testified that he was POST-certified as a crime-scene technician by the Georgia Police Academy, and that his chief responsibility in his current job with Fulton County was to process crime scenes, which included the collection of evidence.

At the motion for new trial hearing, Flannigan's trial counsel testified that "[i]t was clear to [him] that [Officer Remmick] was a crime scene technician and that he had worked in the field and what he had done at trial or in preparation for trial was pursuant to what his training was." He added that he thought Remmick was "actually qualified" to testify regarding fingerprint evidence and that, if he had objected to Remmick's testimony, it "wouldn't have made any difference."

Pretermitting whether counsel was deficient for failing to object under these circumstances, we turn to the prejudice prong of the *Strickland* inquiry and conclude that Flannigan has failed to show prejudice here. Based on the record and especially given that Remmick had extensive experience in crime-scene investigations and that trial courts have broad discretion to qualify experts, Flannigan has not shown a reasonable probability that, if trial counsel had objected to Remmick's qualifications, the State would not have been able to qualify Remmick as an expert and the trial court would have sustained an objection to Remmick's expert testimony. Flannigan therefore has failed to establish prejudice on this claim of ineffective assistance. See, e.g., *Prothro v. State*, 302 Ga. 769, 772 (809 SE2d 787) (2018) (holding that the defendant failed to show prejudice on his claim that trial counsel was ineffective in filing an untimely motion for expert assistance because he had "not shown a reasonable probability that the requested expert testimony would have been admitted if the motion had been filed earlier"); *Brewner v. State*, 302 Ga. 6, 16 (804 SE2d 94) (2017) (holding that the defendant failed to show prejudice on his claim that trial counsel was ineffective in failing to object to the lack of voice authentication of an audio recording of his phone call because, although the State did not present testimony from anyone who was familiar with the

9

defendant's voice, trial counsel testified at the motion for new trial hearing that he thought that it was the defendant's voice on the recording and that "any objection based on lack of authentication could have been overcome by readily available evidence"). Flannigan's first ineffective-assistance claim therefore fails.

(b) Flannigan next claims that trial counsel was ineffective for failing to impeach Vantrez Jones, Flannigan's co-indictee, by questioning Jones about the possible life sentences that he faced under the same indictment as Flannigan. However, because Jones did not have a concrete plea deal with the State in exchange for his testimony, the trial court could have exercised its discretion to prohibit trial counsel from questioning Jones about the potential penalties that he faced. See *Smith v. State*, 300 Ga. 538, 542 (796 SE2d 666) (2017) (holding that the trial court did not abuse its discretion in prohibiting cross-examination about the potential sentences that a co-indictee witness faced where the witness did not have "a concrete plea deal" in exchange for his testimony); *Cheley v. State*, 299 Ga. 88, 94 (786 SE2d 642) (2016) (same with regard to two witnesses who were jailhouse informants and who testified for the State). Because Flannigan has failed to establish that questions regarding Jones's possible sentences would have been allowed at trial, he has

10

not carried his burden to show that trial counsel performed deficiently. See *Williams v. State*, 292 Ga. 844, 851–852 (742 SE2d 445) (2013) (holding that the defendant failed to carry his burden to show that trial counsel was ineffective for failing to impeach a witness with two prior felony convictions where the record showed that the trial court would not have abused its discretion by excluding those convictions even if trial counsel had objected). His second claim also fails.

3. Flannigan contends that Tiera Jones's testimony that Flannigan attacked her shortly after Ragsdale's murder was impermissible evidence of his bad character and that the trial court erred in admitting it.[4] We disagree.

After Tiera described the attack at trial, Flannigan objected that the testimony was irrelevant and moved to strike it. The prosecutor said that she had a "follow-up question to make it relevant," and asked Tiera why Flannigan attacked her in her vehicle. The trial court interrupted, indicating that it thought that the testimony was relevant to explain why the driver's side

---

[4] At the time of Flannigan's trial, former OCGA § 24–2–2 provided: "The general character of the parties and especially their conduct in other transactions are irrelevant matter unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct."

11

window in Tiera's car was covered in plastic,[5] but nonetheless allowed Tiera to offer another basis on which the testimony could be deemed relevant. Upon further questioning by the prosecutor, Tiera testified that Flannigan had overheard her talking to a police detective about the case and that he attacked her "[be]cause he said I was talking to the police."

The admission of evidence "'lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion.'" *Young v. State*, 297 Ga. 737, 739 (778 SE2d 162) (2015) (quoting *Benford v. State*, 272 Ga. 348, 350 (528 SE2d 795) (2000)). "In Georgia, 'evidence of a defendant's attempt to influence or intimidate a witness can serve as circumstantial evidence of guilt.'" *Wade v. State*, 304 Ga. 5, 12 (815 SE2d 875) (2018) (citation omitted). Moreover, "'[r]elevant evidence is not rendered inadmissible because it incidentally puts the defendant's character into issue.'" *Moore v. State*, 295 Ga. 709, 714 (763 SE2d 670) (2014) (citation omitted). Here, because there was evidence that Flannigan attacked Tiera

---

[5] The photograph of Tiera's car that was admitted into evidence showed that the driver's side window was covered with plastic, and at least one witness—who testified that he saw Tiera's car on the day of the crimes at the apartment complex where the crimes occurred— was questioned at trial about the discrepancy between how the car looked at the time of the crimes and how it looked in the photograph that was admitted into evidence.

12

because he thought that she was talking to the police, we conclude that the trial court did not abuse its discretion in admitting her testimony.  See id.

Judgment affirmed.  All the Justices concur.